**BP PRODUCTS NORTH AMERICA, INC., and United States Steel Corporation, Appellants,**

v.

**INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR and Northern Indiana Public Service Company, Appellees.**

**No. 93A02–0905–EX–490.**

Court of Appeals of Indiana.

April 25, 2011.

James A. Strain, Geoffrey Slaughter, John F. Wickes, Jr., Todd A. Richardson, Joseph P. Rompala, Indianapolis, IN, Attorneys for Appellants.

Michael B. Cracraft, Joseph M. Hendel, Indianapolis, IN, Attorneys for Appellees.

## OPINION

SHARPNACK, Senior Judge.

### STATEMENT OF THE CASE

Appellants BP Products North America, Inc. ("BP"), and United States Steel Corporation ("U.S. Steel") appeal from a decision made by the Indiana Utility Regulatory Commission ("the Commission") involving Appellee Indiana Office of Utility Consumer Counselor and Appellee/Cross–Appellant Northern Indiana Public Service Company ("NIPSCO"). We reverse and remand in part and affirm in part.

### ISSUES

The following restated issues are dispositive:

I. Whether the Commission erred in determining that BP was acting as a "public utility" as that term is defined under Indiana law.

II. Whether the Commission erred in holding that BP violated Indiana's Service Area Assignments Act, a statute governing electricity suppliers.[1]

### FACTS AND PROCEDURAL HISTORY

BP's petroleum refinery plant in Whiting, Indiana, is the nation's largest inland refinery, covering approximately 1400 acres and possessing the capacity to process more than 400,000 barrels of crude oil per day. At the plant, BP refines oil into various petroleum distillates, including diesel fuel and gasoline. As part of its process of refining crude oil, BP creates its own supply of industrial-use water by drawing raw, untreated water from Lake Michigan through its intake pipe and processing the water at its on-site treatment plant. BP also generates steam and uses electricity and natural gas obtained from NIPSCO to power the significant industrial processes operating throughout the refinery. BP transmits the gas and electricity internally through its own private distribution systems within the refinery's footprint to run its oil-refining operation.

Over the years, BP has entered into contracts with adjacent and on-site private entities whereby it provides certain services either at cost or at a slight margin. BP provides excess steam from its refining process to the adjacent U.S. Steel facility, with the steam conveyed through BP pipes directly to U.S. Steel pipes. BP provides steam and sewer service to the adjacent

---

1. Other issues raised on direct appeal and cross-appeal are rendered moot by our resolution of these issues.

Ineos Chemical Plant, with the steam conveyed through BP pipes directly to Ineos pipes. BP provides low pressure raw service water to the adjacent Praxair facility. BP also provides low pressure raw service water to the City of Whiting, which the City then treats and distributes to its customers. BP also provides services to Marsulex, a tenant located within the refinery property that performs essential services as part of BP's manufacturing process. The services provided to Marsulex include low pressure raw service water, partially treated non-potable water, electricity, steam, process sewer treatment, and natural gas.

On June 27, 2008, BP filed a verified petition with the Commission generally describing BP's refinery processes and its contractual relationships with Marsulex and the entities adjacent to BP's property. BP primarily requested that the Commission find that the provision of services pursuant to private contract does not make BP a public utility. In the alternative, BP requested that if the Commission should find BP to be acting as a public utility, that the Commission decline to exercise jurisdiction over BP pursuant to Indiana Code section 8–1–2.5–5 (1995)[2] and Indiana Code sections 8–1–2–61.5(d) and 61.5(e) (2001).[3] BP further requested that if the Commission chose to exercise its jurisdiction, that the Commission issue the necessary certificates, permits, or authority needed for operation.[4]

In an order issued on May 13, 2009, the Commission determined that BP "is not a public utility with respect to the transportation of natural gas service to Marsulex." Appellants' Joint App. p. 26. The Commission further determined that BP "is providing utility services to the public and is a public utility with respect to the provision of steam, electricity, water, and wastewater/process sewer services...." Appellants' Joint App. p. 22.

The Commission found that a partial declination over BP's sale of steam is appropriate "given the particularly unique facts and circumstances of [the] case." Appellants' Joint App. p. 23. The Commission found that Marsulex, Ineos, and Praxair produce products that are integral to BP's refining process and that the steam BP sells to these entities is necessary for the creation of their own products. Accordingly, the Commission found that "the exchange of services is essential to the products BP, Ineos, Marsulex, and Praxair produce." *Id.* The Commission concluded that BP's primary business "is refining oil and not the sale of steam." *Id.* Therefore, "the sale of steam is a result of contracts [with Ineos and Praxair] and a lease agreement [with Marsulex], pursuant to which BP sells the steam at cost or at a slight margin to customers located either within the [refinery's] boundaries or contiguous to it." *Id.*

The Commission further determined that it lacked statutory authority to decline to exercise jurisdiction over BP's provision of water or wastewater/process sewer operations. Accordingly, the Commission created a "Subdocket in this Cause to es-

2. Subsection (a) of this statute provides in pertinent part that the Commission, when public interest requires, may decline to exercise jurisdiction, in whole or in part, over an energy utility or the retail energy service of the energy utility, or both.

3. These subsections provide in pertinent part that the Commission may adopt rules or enter orders that are in the public interest and that may promote denominated purposes.

4. U.S. Steel was granted the right to intervene, and it appeared and participated in the evidentiary hearing on BP's verified petition. Appellants' Joint App. p. 10.

tablish BP's tariff, rates and charges or to establish a regulatory plan ... for water and wastewater/process sewer service." Appellants' Joint App. p. 25.

The Commission determined that it would not decline jurisdiction over BP with respect to BP's furnishing of electricity to Marsulex, primarily because BP "does not possess an assigned service area for the provision of retail electric service pursuant to Indiana Code § 8–1–2.3 *et seq.*, and no evidence to the contrary was offered by the parties." *Id.* at 24. The Commission noted that Indiana Code section 8–1–2.3–1 (1980) provides for the creation of assigned service areas for electricity suppliers, and states, "[I]n order to promote economical, efficient, and adequate electric service to the public, the currently unincorporated areas of Indiana shall be divided into designated geographic areas within which an assigned electricity supplier has the sole right to furnish retail electric service to customers." *Id.* The Commission directed BP to "enter into discussions with NIPSCO regarding BP's provision of electric service within NIPSCO's assigned service territory with the intent to reach an amicable resolution." *Id.* at 25.

BP and U.S. Steel initiated an appeal in this court on May 29, 2009. BP also entered into discussions with NIPSCO as directed by the Commission. In those discussions, BP learned of an earlier agreement between NIPSCO and Amoco, BP's predecessor. A stay of the appeal and remand to the Commission were sought and granted so that BP could return to the Commission and present the agreement. In its subsequent order of June 23, 2010, the Commission noted:

> On August 11, 2009, BP filed with the Commission a Notice of NIPSCO's 1999 Contractual Consent to BP's Allocation

of Electricity to Geographically Contiguous Affiliates and Third Parties ("Notice of Consent"). Attached to the Notice of Consent were: (i) a redacted copy of a Contract for Electric Service and Energy between BP's predecessor, BP Amoco Company ("Amoco"), and NIPSCO, which was entered into on July 22, 1999 (the "Contract") and is still effective; and (ii) a Commission Order dated March 22, 2000 in Cause No. 41608 approving the Contract. The Notice of Consent indicated that the attorneys and witnesses were unaware of the existence of the Contract and the March 22, 2000 Order. The Notice of Consent further asserted that as a result of the Contract and the Commission's March 22, 2000 Order, BP has received NIPSCO's consent to provide electric service to Marsulex and is not in violation of Ind.Code § 8–1–2.3–4.

Appellants' Joint App. pp. 27–28.[5] The Commission further noted:

> Indiana Code § 8–1–2.3–4(a) provides in pertinent part that "no other electricity supplier shall render or extend retail electric service within its assigned service area unless the electricity supplier with the sole right consents thereto in writing and the commission approves." By definition, "electricity supplier" means "a public utility ... which furnishes retail electric service to the public." Ind.Code § 8–1–2.3–2(b).

*Id.* at 28, n. 1.

The Commission, however, found that the BP (Amoco) contract with NIPSCO "does not alter the Commission's determination that BP is acting as a public utility by providing electric utility service to Marsulex. BP is providing electric service to an entity other than itself and is therefore

5. NIPSCO was not a party to the original BP petition consideration. It intervened and became a party on remand. Appellants' Joint App. p. 28.

a public utility pursuant to Ind.Code § 8–1–2–1 and Ind.Code § 8–1–6–3. Therefore, the Commission's previous finding is affirmed." *Id.* at 30.

The Commission further found that the BP (Amoco) contract with NIPSCO:

> [D]oes not change the fact that BP does not possess an assigned service territory and cannot legally furnish electric service within Indiana. Under Indiana law, NIPSCO cannot consent to the provision of electric service within its service territory by an entity that does not possess an assigned service territory.

> Accordingly, based on the evidence presented on remand and in the underlying proceeding, the Commission affirms its previous finding that BP is a public utility with respect to its provision of electric service to Marsulex. However, based on the law and applicable statutes, the Commission finds that BP does not possess the necessary legal authority to provide electric service to an entity other than itself. Therefore, BP must cease its service activity consistent with our prior findings. NIPSCO's consent under Section 12(2) of the Contract does not provide BP with such legal authority or modify our prior determination on this issue.

*Id.* at 31.

## DISCUSSION AND DECISION

### STANDARD OF REVIEW

■ As a general rule we employ a two-tiered standard when we review an order by the Commission. *Hancock Cnty. Rural Elec. Corp. v. City of Greenfield,* 768 N.E.2d 909, 911 (Ind.Ct.App.2002). First, we determine whether the decision is supported by specific findings of fact and by sufficient evidence. Second, we consider whether the decision is contrary to law. *Id.* A decision is contrary to law

when the Commission fails to stay within its jurisdiction and to abide by the statutory and legal principles which guide it. *Id.* Here, the facts are undisputed, and the issues involve the Commission's interpretation of statutory language. The interpretation of a statute is a question of law reserved for the courts, and we review such interpretation under a de novo standard. *Ind.-Ky. Elec. Corp. v. Comm'r, Ind. Dep't of Envtl. Mgmt.,* 820 N.E.2d 771, 777 (Ind.Ct.App.2005). The interpretation of a statute by the administrative entity charged with the duty of enforcing the statute is entitled to great weight. *Id.* However, no weight is given to an incorrect interpretation. *Id.*

### I. STATUTORY LANGUAGE: WHAT IS A PUBLIC UTILITY?

■ In its May 13, 2009 order, the Commission stated that it "need only to determine whether or not BP is providing these utility services 'either directly or indirectly to the public.'" Appellants' Joint App. p. 20. After discussing this court's holdings in *U.S. Steel Corp. v. Northern Ind. Pub. Serv. Co.,* 482 N.E.2d 501 (Ind.Ct.App. 1985), *trans. denied,* and *Knox Cnty. Rural Elec. Membership Corp. v. PSI Energy, Inc.,* 663 N.E.2d 182 (Ind.Ct.App.1996), *trans. denied,* the Commission determined, as stated above, that BP "is providing utility services to the public and is a public utility with respect to the provision of steam, electricity, water and wastewater/process sewer services pursuant to Indiana Code § 8–1–2–1(a) and Indiana Code § 8–1–6–3." Appellants' Joint App. p. 22.

Indiana Code section 8–1–2–1(a) (2006) provides the definition of a "public utility":

> Except as provided in section 1.1 of this chapter, "public utility", as used in this chapter, means every corporation, company, partnership, limited liability com-

pany, individual, association of individuals, their lessees, trustees, or receivers appointed by a court, that may own, operate, manage, or control any plant or equipment within the state for the:

(1) conveyance of telegraph or telephone messages;

(2) production, transmission, delivery, or furnishing of heat, light, water, or power; or

(3) collection, treatment, purification, and disposal in a sanitary manner of liquid and solid waste, sewage, night soil, and industrial waste.

The term does not include a municipality that may acquire, own, or operate any of the foregoing facilities.[6]

The term is similarly defined in Indiana Code section 8-1-6-3 (1984), which states:

The term "public utility", as used in this chapter, shall mean and embrace every corporation, company, cooperative organization of any kind, individual, association of individuals, their lessees, trustees, or receivers appointed by any court whatsoever that on or after March 15, 1969, may own, operate, manage, or control any plant or equipment within the state for the conveyance of telegraph or telephone messages, or for the production, transmission, delivery, or furnishing of heat, light, water, or power, or for the collection, treatment, purification, and disposal in a sanitary manner of liquid and solid waste, sewage, night soil, and industrial waste, for service directly or indirectly to the public, but said term shall not include a municipality that may after March 14, 1969, ac-

quire, own, or operate any of the foregoing facilities.

In *U.S. Steel*, we considered whether a steel producer was a "public utility" under Indiana Code section 8-1-2-1 (the same statute that applies in this case). U.S. Steel owned two production facilities: Gary Works in Indiana, which was supplied with electricity by NIPSCO, and South Works in Chicago, which was supplied with electricity by the Commonwealth Edison Company. U.S. Steel brought a declaratory judgment action to determine whether its planned transmission through a transformer of power purchased from Commonwealth and mixed with NIPSCO's power to supply Gary Works, coupled with transmission of power to be purchased from NIPSCO and mixed with Commonwealth's power to supply South Works, would be subject to regulation by the Commission.

We held that the Commission's predecessor, the Public Service Commission of Indiana ("PSCI"), did not acquire jurisdiction over U.S. Steel because U.S. Steel did not qualify as a "public utility" as defined by Indiana statutes. 482 N.E.2d at 504. We noted that "[u]pon dedication of a business to a public use, it is established that such business is under a common law duty to serve all who apply so long as facilities are available without discrimination." *Id.* at 505–506 (citing *Portland Natural Gas & Oil Co. v. State ex rel. Keen*, 135 Ind. 54, 34 N.E. 818 (1893); *Hockett v. State*, 105 Ind. 250, 5 N.E. 178 (1886); 73 C.J.S. *Public Utilities*, § 7, p. 998). We also noted that at the very minimum, "[i]t is an

---

6. The words "directly or indirectly to or for the public" were inadvertently omitted from an amendment to the statute but are considered to be part of section 1(a)(2). Accordingly, an entity listed in the statute cannot be a "public utility" unless it produces, transmits, delivers, or furnishes heat, light, water, or power " 'either directly or indirectly' to the public." *See U.S. Steel Corp. v. Northern Ind. Pub. Serv. Co.*, 486 N.E.2d 1082, 1084–85 (Ind.Ct.App.1985), *trans. denied* (the denial of rehearing for the *U.S. Steel* case cited above).

essential requirement that a business or enterprise must in some way be impressed with public interest before it may become a public utility." *Id.* at 506. We further noted that whether a given business is a public utility "depends on whether or not the service rendered by it is of a public character and of public consequence and concern, which is a question necessarily dependent on the facts of the particular case." *Id.* (citing *Foltz v. City of Indianapolis*, 234 Ind. 656, 130 N.E.2d 650, 654–56, 659 (1955)). We held that U.S. Steel's transmission did not "impress" U.S. Steel with a public interest, that PSCI did not have jurisdiction over U.S. Steel and, therefore, that the laws regulating public utilities would not apply. *Id.* Furthermore, on rehearing we stated, "[a]ny attempt to impress public utility status upon private property not dedicated to public use constitutes a taking thereof for public use without just compensation in violation of the Fourteenth Amendment." *U.S. Steel*, 486 N.E.2d at 1085.

In *Knox*, we upheld the right of a coal mine operator to engage in private distribution of electricity within its private property without becoming subject to "public utility" regulation, even though the electricity was being distributed over the boundary between the service territories of two electric utilities. We quoted *U.S. Steel* for the proposition that an entity must in some way be impressed with a public interest before it may become a public utility. 663 N.E.2d at 194 (quoting *U.S. Steel*, 482 N.E.2d at 506). We noted that in *Knox*, there was no question whether power was provided to the public because, as in *U.S. Steel*, the provider was transmitting its own power within its own property. Thus, there was no chance that either was transmitting power to the "public."

In the case before us, in its June 23, 2010 order, the Commission is very clear about the basis for its decision, as it states that "BP is providing electric service to an entity other than itself and is therefore a public utility pursuant to Ind. Code § 8–1–2–1 and Ind.Code § 8–1–6–3." Appellants' Joint App. p. 30. The Commission relied on *U.S. Steel* and *Knox* to support its conclusion that service to another entity brought BP under its jurisdiction as a public utility. While *U.S. Steel* and *Knox* support the principle that an entity which serves only itself is not a "public utility," they do not support the proposition that only an entity that serves only itself is not a "public utility." They do not hold that any entity that serves a separate entity or entities is per se a "public utility." Indeed, as described above, a "public utility" is one that is "dedicated to public use"; "under a common law duty to serve all who apply so long as facilities are available without discrimination"; "impressed with public interest"; and a provider of service "of a public character and of public consequences and concern."

Although there are no Indiana cases directly on point, there are cases from other jurisdictions which are similar to the instant case and which provide guidance in interpreting both Indiana Code section 8–1–2–1 and Indiana Code section 8–1–6–3. We examine a sampling of those cases below.

In *City of Sun Prairie v. Pub. Serv. Comm'n*, 37 Wis.2d 96, 154 N.W.2d 360, 361 (1967), the court was asked to determine whether the Public Service Commission ("PSC") was correct in determining that a landlord who furnished heat, light, water and power to its tenants under a private contract was a "public utility" producing, transmitting, delivering, or furnishing utility services "directly or in-

directly to the public."[7] The court concluded that PSC misinterpreted the statute, and it held in favor of the landlord. The court stated that an earlier case, *Cawker v. Meyer*, 147 Wis. 320, 133 N.W. 157 (1911), was "determinative of the result." *Id.* In *Cawker*, the landlord constructed a building to be rented for stores, offices, and light manufacturing. A steam plant was installed therein to generate heat, electric light, and power to be furnished to the tenants and occupants of the building who desired such utility service. Because the landlord was unable to dispose of all of the heat and electricity to his tenants, he entered into contracts with three adjoining property owners to furnish them with heat and power. The Wisconsin Railroad Commission, the predecessor of PSC, determined that the landlord was a public utility because the "furnishing of heat, light, and power 'to anyone else than to one's self is furnishing it to the public within the meaning of the statute.'" *Id.* at 362, 133 N.W. 157 (quoting *Cawker*, 133 N.W. at 158).

In concluding that the Commission had erred, the *Cawker* court stated:

> It was not the furnishing of heat, light, or power to tenants, or, incidentally, to a few neighbors, that the Legislature sought to regulate, but the furnishing of those commodities to the public; that is, to whoever might require the same. The use to which the plant, equipment, or some portion thereof is put must be for the public, in order to constitute it a public utility.
>
> But whether or not the use is for the public does not necessarily depend upon the number of consumers; for there may be only one, and yet the use be for

the public, as where a plant is built and operated for furnishing power to the public generally, but for a time finds one consumer who uses it all.... On the other hand, a landlord may furnish it to a hundred tenants, or, incidentally, to a few neighbors, without coming either under the letter or intent of the law. In the instant case, the purpose of the plant was to serve the tenants of the owners, a restricted class, standing in a certain contract relation with them, and not the public. The furnishing of power, light, and heat to a few neighbors was incidental merely and limited to them....

> It is very difficult, if not impossible, to frame a definition for the word "public" that is simpler or clearer than the word itself. The Century Dictionary defines it as: "Of or belonging to the people at large; relating to or affecting the whole people of a state, nation, or community; not limited or restricted to any particular class of the community." The New International defines it as: "Of or pertaining to the people; relating to or affecting a nation, state or community at large." The tenants of the landlord are not the public; neither are a few of his neighbors, or a few isolated individuals with whom he may choose to deal, though they are a part of the public. The word "public" must be construed to mean more than a limited class defined by the relation of landlord and tenant, or by nearness of location, as neighbors, or more than a few who, by reason of peculiar relation to the owner of the plant, can be served by him.

*Cawker*, 133 N.W. at 158–59 (citations omitted).

---

7. The statute is currently found at WIS. STAT. § 196.01(5)(a) (2011). It states that a designated entity is a "public utility" if it owns, operates, manages or controls "all or any part of a plant or equipment, within the state, for the production, transmission, delivery or furnishing of heat, light, water or power either directly or indirectly to or for the public."

In *Drexelbrook Assocs. v. Pa. Pub. Util. Comm'n*, 418 Pa. 430, 212 A.2d 237, 239 (1965), the court was asked to determine whether the Public Utility Commission was correct in determining that an entity was subject to the public utility laws because it furnished services "to or for the public." The entity was the owner of a real estate development with a garden-type apartment village of 90 buildings containing 1,223 residential units, 9 retail stores, and a club with a dining room, swimming pool, skating rink, and tennis courts. The *Drexelbrook* court first cited *Borough of Ambridge v. Pub. Serv. Comm'n*, 108 Pa.Super. 298, 165 A. 47 (Pa.Super.Ct.1933), where a manufacturer who furnished water to another manufacturer was held not to be servicing the public because "[t]he public or private character of the enterprise does not depend ... upon the number of persons by whom it is used, but upon whether or not it is open to the use and service of *all members of the public* who may require it...." *Id.* at 239, 165 A. 47 (citing *Ambridge*, 108 Pa.Super at 304, 165 A. at 49) (emphasis in *Drexelbrook*). The *Drexelbrook* court also cited *Overlook Dev. Co. v. Pub. Serv. Comm'n*, 101 Pa.Super. 217 (Pa.Super.Ct.1930), *aff'd per curiam*, 306 Pa. 43, 158 A. 869 (1932), which involved a land development company that distributed water not only to vendees situated on its previously owned tract of land, but also to owners of adjacent land. The *Drexelbrook* court cited *Overlook* for the proposition that the service was not open to the indefinite public but, being confined to privileged individuals, was private in na-

ture. The *Drexelbrook* court then overturned the Commission, holding that the owner's tenants, although many in number, did not constitute "the public" within the meaning of the Public Utility Law, but instead constituted "a defined, privileged and limited group" to whom the proposed service would be "private in nature." *Id.* at 240.

In the present case, BP, which is in the business of refining oil, not producing utility services for the undifferentiated public, nevertheless found that it created excess amounts of such utility services through its refinery process. BP entered into private contracts to provide those excess services to U.S. Steel, Praxair, Ineos, and Marsulex, entities who, as adjacent property owners and/or providers of services within the refinery business, were a defined, privileged, and limited group. Because BP served these selected companies—a special class of entities that did not make up the indefinite public—it was engaged in a private activity, not the provision of services directly or indirectly to the public. Thus, as to these entities, the Commission, which erroneously interpreted both the controlling statutes and related case law, must vacate its orders and allow BP to proceed outside its jurisdiction.[8]

■ However, we see BP's contract with the City of Whiting in a different light. The contract provides for the provision of water to an entity that is a mere conduit serving the undifferentiated public, at least indirectly. Accordingly, BP is acting as a public utility when it sells water to the City.

---

8. We note that NIPSCO engages in speculation about the possible evils that might flow from BP's unregulated activities under the statutes and the case law. We join the *Drexelbrook* court in concluding that "[s]uch reasoning disregards that express formulation of public policy by the Legislature embodied in the statutory definition of the term 'public utility.' That provision confers jurisdiction on the Commission *only* where the service involved is rendered [directly or indirectly] 'to or for the public.'" 212 A.2d at 242. (emphasis in original).

## II. STATUTORY LANGUAGE: DOES BP'S PROVISION OF ELECTRICITY TO MARSULEX VIOLATE INDIANA CODE SECTION 8–1–2.3 et seq.?

■ The Commission found in both the May 13, 2009 and June 23, 2010 orders that BP, with reference to Marsulex, was an "electricity supplier" that was rendering electric service within NIPSCO's assigned service area. It concluded that BP was in violation of Indiana Code section 8–1–2.3–4 (1980), which states:

(a) As long as an electricity supplier continues to provide adequate retail service, it shall have the sole right to furnish retail electric service to each present and future consumer within the boundaries of its assigned service area and no other electricity supplier shall render or extend retail electric service within its assigned service area unless the electricity supplier with the sole right consents thereto in writing and the commission approves. . . .

(b) If an electricity supplier unlawfully renders or extends retail electric service within the assigned service area of another electricity supplier, the electricity supplier which has the sole right to furnish retail electric service in that assigned service area may bring an action in the circuit or superior court of the county where such assigned service area is located to enjoin the other electricity supplier from rendering or extending such unlawful retail electric service.

If a violation is proved, the violator shall pay to the aggrieved electricity supplier the gross revenues derived by the violator from the sale of electric service within the assigned service area of the aggrieved electricity supplier, all witness fees, court costs and reasonable attorneys' fees incurred in any litigation brought to enforce this section. Payment of damages, fees and costs does not entitle a violator to furnish retail electric service in such assigned service area. All such actions or proceedings must be brought within three (3) years after the violation occurs.

Indiana Code section 8–1–2.3–2(b) (1988) defines an "electricity supplier" as "a public utility, a local district rural electric membership corporation, or a municipally owned electric utility which furnishes retail electric service to the public." It is uncontested that BP is neither a local district rural electric membership corporation nor a municipally owned electric utility. As we determined in Issue I, BP also is not acting as a public utility when it supplies electricity to Marsulex. Accordingly, the Commission erred in determining that BP is an "electricity supplier" as that term is used in Indiana Code section 8–1–2.3–1 et seq.

### CONCLUSION

The Commission erred in its interpretation of the controlling statutes and case law as they apply to BP's contracts with U.S. Steel, Ineos, Praxair, and Marsulex. Accordingly, we reverse the Commission's order as it applies to these contracts, and we remand with instructions that the Commission vacate this portion of the order. We affirm the Commission's order as it pertains to BP's contract with the City of Whiting.

Reversed and remanded in part and affirmed in part.

VAIDIK, J., and BRADFORD, J., concur.