

FILED

May 31 2018, 11:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Todd A. Richardson
Bette J. Dodd
Joseph P. Rompala
Lewis & Kappes, PC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Brian J. Paul
Daniel E. Pulliam
Faegre Baker Daniels LLP
Indianapolis, Indiana

Claudia J. Earls
M. Bryan Little
Nisource Corporate Services
Indianapolis, Indiana

William I. Fine
Randall C. Helmen
Tiffany T. Murray
Office of Utility Consumer
Counselor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| NIPSCO Industrial Group, <br><br> *Appellant-Intervenor,* <br><br> v. <br><br> Northern Indiana Public Service Company and Office of the Utility Consumer Counselor, <br><br> *Appellees-Petitioner.* | May 31, 2018 <br><br> Court of Appeals Case No. 93A02-1711-EX-2735 <br><br> Appeal from the Indiana Utility Regulatory Commission <br><br> The Honorable David Veleta, Senior Administrative Law Judge <br><br> Cause No. 44733-TDSIC-2 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Intervenor, NIPSCO Industrial Group, appeals the Order of the Indiana Regulatory Commission (Commission) in which the Commission authorized Appellee-Petitioner, Northern Indiana Public Service Company (NIPSCO), to impose a statutory regulated rate adjustment based on total load on its utility customers.

We reverse.

# ISSUE

NIPSCO Industrial Group presents us with two issues on appeal, one of which we find dispositive and which we restate as: Whether the Commission failed to comply with Indiana Code section 8-1-39-9(a)(1), which requires the allocation of a rate adjustment to be based on firm load, by approving NIPSCO's computation which utilized an allocation based on total load.

# FACTS AND PROCEDURAL HISTORY

NIPSCO is a public electric and gas utility that services over 461,000 residential, commercial, industrial, wholesale, and other customers in Indiana. The NIPSCO Industrial Group represents a group of five of NIPSCO's largest industrial customers.

As with other utilities, NIPSCO recovers its costs for providing electric service through rates approved by the Commission. Traditionally, a utility's rates charged to customers are adjusted through periodic rate cases, which are

expensive, time consuming, and sometimes result in large, sudden rate hikes for customers. Another method to set rates is through 'tracker' proceedings, which allow incremental increases for specific projects and costs between general rate case proceedings. In 2013, the General Assembly enacted Indiana Code Chapter 8-1-39, which allows a utility to petition for a tracker for certain proposed new or replacement Transmission, Distribution, and Storage System Improvement Charge or TDSIC (TDSIC Statute). Thus, in contrast to traditional regulation in which utility rates are determined through general rate cases based on comprehensive review of the utility's finances and operations, the TDSIC permits incremental rate adjustments at six-month intervals to reflect specific costs associated with defined infrastructure projects. Pursuant to section 10 of the TDSIC Statute, an energy utility must first secure regulatory approval for a 7-year plan designating an eligible project that the utility proposes to construct. *See* Ind. Code § 8-1-39-10. Once a 7-year plan is approved, the utility may then file petitions every six months under Section 9, seeking rate adjustments that reflect costs as they are incurred on approved projects. *See* I.C. § 8-1-39-9. Specifically, section 9 mandates that a periodic adjustment of the basic rate must, among others, "use the customer class revenue allocation factor based on firm load approved in the utility's most recent retail base rate case order[.]" I.C. § 8-1-39-9(a)(1).

[6] The statutory phrase "based on firm load" refers to a distinction between utility services rendered on a firm as opposed to an interruptible basis. *See* I.C. § 8-1-39-9(a)(1). For customers electing firm service, the utility is required to provide

service with a high degree of reliability, whereas interruptible service is subject to interruption as needed to meet the needs of customers, and is thus less reliable. Because the utility does not have to build capacity and maintain resources to meet interruptible demand, the service promotes efficiency and reduces the level of needed investment, to the benefit of the interruptible load ratepayers. Accordingly, NIPSCO serves distinct customer classes under different rate schedules that reflect the service each class elects. NIPSCO's tariff includes seventeen different rate classes and large volume customers, like the NIPSCO Industrial Group, who receive firm services under three different industrial rate schedules. Within the limits defined in the three industrial rate schedules, the customers may designate a portion of their load as interruptible, with the rest of their demand falling within the firm load service.

[7] The aggregate TDSIC costs recoverable in a given six-month period are used to compute revenue requirements, which is the amount of additional dollars that NIPSCO seeks to collect from its customers collectively. Those revenue requirements are then divided among the different customer classes based on allocation factors derived from the most recent general rate case. *See* I.C. § 8-1-39-9(a)(1). Once the dollar amount to be recovered from each customer class is determined, specific rate factors are computed by dividing the revenue total for the given class by the total projected class consumption for the upcoming six-month period.

[8] In July 2016, the parties entered into the TDSIC Settlement, in which NIPSCO sought the Commission's approval of its 7-year electric plan. Among others,

the parties stipulated in the TDSIC Settlement to a defined structure for TDSIC proceedings, including compromises on the implementation of allocation factors. The TDSIC Settlement noted that "[t]o the extent that terms of this Settlement refer to issues currently pending in Cause No. 44688, the terms approved by the Commission in Cause No. 44688 shall apply to the TDSIC [] proceedings filed in accordance with the 7-Year Electric Plan." (Appellant's App. Vol. III, p. 62). Joint Exhibit D to Cause No. 44688 recognized "class allocation factor percentages [that] shall be applied to the respective distribution – or transmission – related revenue requirement and then the resulting TDSIC charge factor (per kWh) applied to each customer's firm (or non-interruptible) load within that class." (Appellant's App. Vol. II, p. 246).

[9] Six days later, the Commission approved the Settlement Agreement which further specified the allocation factors referenced in the TDSIC Settlement. In approving the Settlement Agreement, the Commission found:

> For purposes of establishing any rate schedules allowing for the recovery of 80% of NIPSCO's approved capital TDSIC expenditures and costs pursuant to Indiana Code § 8-1-39-9(a), the Settling Parties agree that Joint Exhibit D to the Settlement Agreement reflects, pursuant to Indiana Code § 8-1-39-9(a), the customer class revenue allocation facts that should be applied to firm load.

(Appellant's App. Vol. II, p. 152). Likewise, Joint Exhibit D to the Settlement Agreement acknowledged

> pursuant to Indiana Code § 8-1-39-9(a), the customer class revenue allocation factors that should be applied to firm load. The Settling Parties agree that allocation factors shown on Joint Exhibit D to the Settlement Agreement should be applied for the periodic recovery of any approved capital TDSIC expenditures and costs to properly account for difference between transmission and distribution customers.

(Appellant's App. Vol. II, p. 152). It is undisputed by the parties that the revenue allocation factors of Joint Exhibit D "are based on total load, including firm and non-firm load." (Non-Conf. Exh. Vol. II, p. 136).

[10] Subsequently to entering into both agreements, NIPSCO filed a first petition, seeking a rate adjustment in accordance with section 9 of the TDSIC Statute (TDSIC-1). In its petition, NIPSCO adopted a new method to determine the allocation and calculate the newly proposed rates. Specifically, NIPSCO: (1) allocated the revenue requirements using the Settlement Agreement's Joint Exhibit D factors based on total load (firm plus interruptible); (2) computed the rate adjustment by dividing the class revenue portion by the total projected load (firm plus interruptible); and (3) then applied the adjustment only to firm sales and not to interruptible sales. This calculation and application limited the rate increase for firm service to the same adjustment that would have been determined if interruptible load had been removed in the first step of the calculation. The parties did not object to this method of rate adjustment computation and the TDSIC-1 was approved by the Commission.

[11]  NIPSCO filed its second petition for a rate increase (TDSIC-2) under the Settlement Agreement on June 30, 2017. In the TDSIC-2 proceeding before the Commission, NIPSCO proposed an allocation that reflected the distinct transmission and distribution facts, but did not separate out interruptible load. Instead, NIPSCO based its cost allocation (1) on total load, including both firm and interruptible load, and (2) computed the rate adjustment for the different classes based on firm load only, resulting in higher charges to customers in rate classes with substantial interruptible load. The Commission issued its final Order on October 31, 2017, approving NIPSCO's proposed allocation. Specifically, the Commission found:

> Indiana Code [s]ection 8-1-39-9(a)(1) states that the [p]etition must use the customer class revenue allocation factor based on firm load approved in the public utility's most recent retail base rate case order. Specific to the evidence of this proceeding, the [p]arties explicitly agreed to and the Commission approved the allocation factors established in the Rate Case Settlement and the Settlement. Those agreements leave no question as to what factors should be applied and no allowance for subsequent migrations. Thus, we find that the allocation factors reflected in Joint Exhibit D to the Rate Case Settlement are to be used to calculate NIPSCO's TDSIC-2 customer class specific revenue requirement. Further, we find that the derivation of the customer class specific rate factors to collect the class allocated revenue should use the firm load within that class[.]

(Appellant's App. Vol. II, p. 15) (footnote omitted).

[12]  The NIPSCO Industrial Group now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[13] Judicial review of the Commission's decision is governed by Indiana Code section 8-1-3-1, which provides that

> [a]ny person, firm, association, corporation, limited liability company, city, town or public utility adversely affected by any final decision, ruling, or order of the [C]omission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases. An assignment of errors that the decision, ruling, or order of the [C]omission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was ordered.

[14] More specifically, our review is two-tiered:

> On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it. In substantial evidence review, "the appellate court neither reweights the evidence nor assesses the credibility to the [Commission's] findings." The Commission's order is conclusive and binding unless (1) the evidence on which the Commission based its findings was devoid of probative value; (2)

the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; (3) the result of the hearing before the Commission was substantially influenced by improper considerations; (4) there was no substantial evidence supporting the findings of the Commission; (5) the order of the Commission is fraudulent, unreasonable, or arbitrary. This list of exceptions is not exclusive.

At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1317-18 (Ind. 1998), described the judicial task on this score as reviewing conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. Insofar as the order involves a subject within the Commission's special competence, courts should give it greater deference. If the subject is outside the Commission's expertise, courts give it less deference. In either case[,] courts may examine the logic of inferences drawn and any rule of law that may drive the result. Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standard and legal principles involved in producing its decision, ruling, or order.

*Citizens Action Coalition of Ind., Inc. v. Indianapolis Power & Light Co.*, 74 N.E.3d 554, 562-63 (Ind. Ct. App. 2017) (internal citations omitted) (quoting *N. Ind. Pub. Serv. v. U.S. Steel*, 907 N.E.2d 1012, 1016 (Ind. 2009)). However, where the facts are undisputed and the issues involve the Commission's interpretation of the statutory language, we review such interpretation de novo. *BP Products North America, Inc. v. Officer of Utility Consumer Counselor*, 947 N.E.2d 471, 476

(Ind. Ct. App. 2011), *mod'd on reh'g on different grounds*, 964 N.E.2d 234 (Ind. Ct. App. 2011).

[15] The Commission's "authority 'includes implicit powers necessary to effectuate the statutory regulatory scheme.'" *United States Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 795 (Ind. 2000) (quoting *Office of Util. Consumer Counselor v. Pub. Serv. Co.*, 608 N.E.2d 1362, 1363-64 (Ind. 1993)). As a legislative creation, the Commission is limited to exercising "that power which has been conferred upon it by statute." *Citizens Action Coal. Of Ind., Inc.*, 74 N.E.3d at 562. With respect to matters within its jurisdiction, it is accepted that the Commission "enjoys wide discretion." *Id*. at 565. We will not override the Commission's findings and decision simply "because we might reach a contrary opinion on the same evidence." *Id*. The party challenging the Commission's decision bears the burden of showing there is insufficient evidence in the record to support the Commission's findings; it is not enough to "merely cite to other evidence of record which would support a determination more favorable to their position." *Id*. at 565-66.

[16] It is a well-established "basic legislative policy that questions of rate-making methodology are best consigned to the Commission's expertise." *Id*. at 562. In rate cases, "the Commission's primary objective is to establish a level of rates and charges that will permit the utility to meet its operating expenses plus a return on investment which will compensate its investors." *Id*. "In determining fair rates, the Commission considers a representative level of anticipated revenues and expenses and the property employed by the utility to provide

services to its customers." *United States Gypsum, Inc.*, 735 N.E.2d at 798. When the Commission "determines that a utility's rates have become unjust and unreasonable, it may modify them by ordering just and reasonable rates to be charged prospectively." *Id*. Because the "rate-setting procedure is comprehensive[,] the Commission must examine every aspect of the utility's operations and economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years." *Id*. (internal quotation marks omitted).

## II. *Analysis*

The rate-making methodology in this cause is controlled by the TDSIC Statute and two interrelated settlements reached by multiple parties—including the parties on appeal—and formalized by the Commission in two Orders. The parties do not contest the content of the settlements, nor is there a dispute surrounding the meaning of the statutory language; rather the disagreement before us focuses on the application of the agreements and the TDSIC statute in calculating the most recent rate adjustment.

Pointing to the unambiguous language of the TDSIC Statute which requires the customer class revenue allocation factor to be based on firm load, the NIPSCO Industrial Group contends that in its calculation of the proposed rate adjustment in the TDSIC-2, NIPSCO allocated the revenue requirements based on total load, and then, in the second step, switched to firm load when computing the rate adjustment. The NIPSCO Industrial Group maintains that

"[t]he governing statute requires use of firm load for the first step, allocation, but NIPSCO used total load for that step and did not shift to firm load until the second step." (Appellant's Br. p. 20). By allocating on a wider base and the adjusting rates on the smaller subset of firm load customers only, NIPSCO introduced a mismatch that overcharged firm load sales in rate classes with a combined interruptible load. In response, NISPCO and the Officer of the Utility Consumer Counselor (OUCC) appear to concede in their joint appellate brief that "under the TDSIC-2 calculation, the TDSIC adjustment is collected from all ratepayers, including those who take interruptible load." (Appellees' Br. p. 19). They posit that an allocation based on total load rather than firm load is "fair to all ratepayers" and "fairly spread costs across all customer classes." (Appellees' Br. pp. 28, 30).

[19]     In support of its argument, the NIPSCO Industrial Group points to this court's decision in *NIPSCO Indus. Group v. Northern Indiana Public Serv. Co.*, 31 N.E.3d 1 (Ind. Ct. App. 2015), which it claims mirrors the instant situation. In *NIPSCO Indus. Group*, the most recent rate case had been resolved with a settlement featuring an allocation exhibit that did not separate out firm from interruptible load. *Id*. at 13-15. In setting a rate adjustment, NIPSCO proposed an adjustment to the exhibit factors to remove interruptible load in order to comply with the statutory "based on firm load" requirement, which was approved by the Commission over the OUCC's objection. *Id*. at 5. The OUCC contended that the allocation exhibit from the rate case settlement must be utilized without any modification. *Id*. Upon review, we concluded that "the allocation facts

from the [] settlement agreement were based on both firm and non-firm load. Consequently, the adjustment to remove the non-firm load portion was within the Commission's discretion and expertise." *Id*. at 17.

[20] Turning to the cause before us, we reiterate that the TDSIC statute mandates that a periodic adjustment of a utility's basic rate must, among others, "use the customer class revenue allocation factor based on *firm load* approved in the utility's most recent retail base rate case order[.]" I.C. § 8-1-39-9(a)(1) (emphasis added). The most recent base rate case order applicable to TDSIC-2, as referenced in the Statute, is the "Commission's July 18, 2016, Order in Cause No, 44688." (Appellant's App. Vol. II, p. 13). Joint Exhibit D to Cause no. 44688, as incorporated in the TDSIC Settlement, recognized the customer class revenue allocation factors to be applied to firm load. Again, this same requirement of firm load was approved in the Settlement Agreement by incorporating Joint Exhibit D, which should be applied "for the periodic recovery of any approved capital TDSIC expenditures[.]" (Appellant's App. Vol. II, p. 152). However, as acknowledged by all parties, the factors of Joint Exhibit D themselves were determined based on total load.

[21] The contention before us revolves around NIPSCO's proposed calculation of the rate adjustment in TDSIC-2. In TDSIC-2, NIPSCO continued to base the initial allocation step on the Joint Exhibit D factors, without adjustment, as it had done in TDSIC-1. However, instead of continuing to use the total load, as in TDSIC-1, NIPSCO then switched to firm load when computing the unit rate adjustment. Thus, instead of spreading the costs of the adjustment over firm

load and interruptible load and then applying the cost adjustment to firm load only, in TDSIC-2 NIPSCO burdened the cost increase on the firm load percentage only, thereby resulting in a higher price adjustment than when the calculation is computed over a larger customer base (firm plus interruptible load).

[22] The record reflects that at the time Joint Exhibit D was negotiated, the final percentage of interruptible load within each rate class was not yet known and as such, the parties reiterated on the face of the Exhibit that the allocation facts should be applied to firm load. In *NIPSCO Indus. Group*, we approved the removal of the interruptible portion from the allocation factors in computing the rate adjustment. We reach a similar decision here. The TDSIC Statute speaks to the first step—the customer class revenue allocation factor—which it bases on firm load only; the statute does not include any requirements as to the second step—computing unit charges to recover the allocated amount from customers within a given rate class. Therefore, it is not sufficient to merely APPLY the rate adjustment to firm load customers as was done in TDSIC-2, the CALCULATION itself must reflect the firm load basis, as we approved in *NIPSO Indus. Group*. In other words, merely applying the computed rate adjustment on firm load fails to comply with the TDSIC Statute which mandates that the adjustment itself uses the allocation factor based on firm load.

[23] We recognize that the Commission has "the technical expertise to administer regulatory schemes devised by the legislature." *Indiana Office of Util. Consumer*

*Counselor v. Lincoln Utilities, Inc.*, 834 N.E.2d 137, 145 (Ind. Ct. App. 2005), *trans. denied*. "We also give great deference to the [Commission's] rate-making methodology." *Id*. However, the Commission's "authority is limited to that which is granted to it by statute." *Id*. at 142. We conclude that the Commission exceeded its statutory authority by allowing a rate adjustment based on allocation factors computed on total load.

## CONCLUSION

Based on the foregoing, we hold that the Commission failed to comply with Indiana Code section 8-1-39-9(a)(1), which requires allocation of rate adjustment to be based on firm load, by approving NIPSCO's computation which utilized an allocation based on total load.

Reversed.

May, J. and Mathias, J. concur