**UNITED STATES STEEL CORPORATION and ArcelorMittal Indiana Harbor, Inc., Appellants,**

v.

**NORTHERN INDIANA PUBLIC SERVICE COMPANY, Appellee.**

No. 93A02–1006–EX–632.

Court of Appeals of Indiana.

June 9, 2011.

Rehearing Denied Sept. 9, 2011.

John F. Wickes, Jr., Todd A. Richardson, Joseph P. Rompala, Lewis & Kappes, Indianapolis, IN, Attorneys for Appellants.

Robert L. Hartley, Maggie L. Smith, Frost Brown Todd LLC, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

United States Steel Corporation ("U.S. Steel") and ArcelorMittal Indiana Harbor, Inc. ("ArcelorMittal" [1]) (collectively, the "Steel Producers") appeal from the final order of the Indiana Utility Regulatory Commission (the "Commission"), which is defended by Northern Indiana Public Service Company ("NIPSCO"). On appeal, the Steel Producers raise several issues, which we restate and renumber as follows:

    I.  Whether the Commission correctly determined that U.S. Steel's provision of electricity to ArcelorMittal made U.S. Steel a public utility as defined by statute;

    II.  Whether the Commission correctly determined that U.S. Steel violated Indiana's Service Area Assignments Act by selling electricity service to ArcelorMittal within NIPSCO's exclusive electric service area;

    III.  Whether the Commission correctly determined that U.S. Steel's transportation of natural gas to ArcelorMittal made U.S. Steel a public utility as defined by statute;

    IV.  Whether the Commission correctly determined that U.S. Steel violated NIPSCO's gas tariff;

    V.  Whether the Commission properly dismissed the Steel Producers' complaint against NIPSCO.

NIPSCO cross-appeals and, claiming that the Commission failed to address three claims raised in NIPSCO's complaint, seeks a declaration from this court that the Commission's silence on these issues did not amount to an implicit resolution of these claims against NIPSCO and that these claims therefore remain viable theories of recovery in NIPSCO's separate federal court action seeking damages from U.S. Steel. In the alternative, if we determine that the Commission did resolve these issues against NIPSCO, NIPSCO requests remand to the Commission with instructions to enter specific findings on these issues.

We affirm in part, reverse in part, and remand with instructions.

### Facts and Procedural History

U.S. Steel owns and operates a large, integrated steel-making operation in northwest Indiana known as Gary Works. Gary Works covers some 3,000 acres along the south shore of Lake Michigan and lies within NIPSCO's electric and gas service territories. U.S. Steel owns and operates a wide variety of steel production and finishing facilities located within Gary Works.

U.S. Steel consumes a large amount of electricity and natural gas in the operation of Gary Works. Some of the electricity consumed at Gary Works is supplied by cogeneration facilities owned and operated by U.S. Steel within Gary Works. The remaining electricity needed by U.S. Steel for Gary Works is supplied by NIPSCO under a special contract negotiated with U.S. Steel and approved by the Commission in 1999.

NIPSCO delivers, but does not supply, all of the natural gas consumed at Gary Works. U.S. Steel purchases its own supplies of natural gas in the market and has it transported to NIPSCO, which then transports the gas through its local distribution system and delivers it to Gary

---

1.  At the beginning of the time period relevant to this dispute, this entity was known as ISG Indiana Harbor, Inc. As a result of subsequent, unrelated corporate transactions, ISG Indiana Harbor, Inc. became ArcelorMittal Steel USA, Inc., and then Mittal USA, Inc. Because the continuity of interest and operations of these corporate entities is undisputed, we refer to them collectively as ArcelorMittal.

Works. The interconnections and meters at which NIPSCO delivers electricity and natural gas to U.S. Steel are located near the Gary Works property line. U.S. Steel uses its private infrastructure to distribute the electricity and gas delivered by NIPSCO to the various operations within Gary Works.

ArcelorMittal, a competitor of U.S. Steel, owns and operates another large steel-making operation in northwest Indiana, known as East Chicago Works. In 2003, ArcelorMittal and U.S. Steel entered into an agreement to swap facilities located within their respective industrial complexes. Effective November 1, 2003, U.S. Steel became the owner of the Pickle Line located within East Chicago Works, and ArcelorMittal became the owner of the Plate Mill located within Gary Works. The transaction conveyed full right, title, and interest in the Plate Mill and its operations to ArcelorMittal. U.S. Steel retained ownership of the underlying Gary Works real estate, which it leased to ArcelorMittal for a nominal annual rent under a long-term ground lease agreement.

For those not familiar with Gary Works, the size, scope and complexity of its operations are difficult to understand. The Plate Mill is located deep within Gary Works, several miles from the Gary Works property lines. The Plate Mill houses three facilities: (1) a pre-heat facility used to heat slabs of steel, (2) a rolling mill used to flatten heated slabs of steel into plate steel, and (3) a heat treat facility used to temper steel and give it specific, customer-ordered properties.

Upon acquiring ownership of the Plate Mill in November 2003, ArcelorMittal began to operate the heat treat facility, but not the pre-heat facility or the rolling mill. ArcelorMittal did not arrange with NIPSCO for delivery of electricity or gas to the Plate Mill. Instead, ArcelorMittal purchased electricity and gas service for the Plate Mill from U.S. Steel. This arrangement was a continuation of U.S. Steel's previous distribution of gas and electricity to itself when it owned the Plate Mill. NIPSCO was aware that U.S. Steel distributed electricity to the Plate Mill after ownership was transferred to ArcelorMittal, but claims that it believed that ArcelorMittal was not operating the Plate Mill at that time and that U.S. Steel was therefore only transmitting the minimal amount of electricity necessary for "plant protection." Appellant's App. pp. 11, 13.

In May 2007, ArcelorMittal publicly announced its intention to reopen the Plate Mill in September 2007. Because ArcelorMittal had already begun operating the heat treat facility, this announcement represented ArcelorMittal's decision to expand operations at the Plate Mill to include operation of the pre-heat facility and the rolling mill. As a result, NIPSCO contacted ArcelorMittal about providing electricity and gas service to the Plate Mill.

Over the summer of 2007, the Steel Producers and NIPSCO met numerous times regarding electricity and gas service to the Plate Mill. The parties reached an agreement under which NIPSCO installed an electricity sub-meter inside Gary Works on U.S. Steel's privately-owned electricity distribution lines to measure the flow of electricity to the Plate Mill. Pursuant to the agreement, electricity delivered by NIPSCO would flow through the interconnection between NIPSCO and U.S. Steel and across U.S. Steel's internal electricity distribution system to NIPSCO's sub-meter at the Plate Mill. NIPSCO would bill ArcelorMittal based on the readings of the sub-meter, and for the purposes of billing U.S. Steel, NIPSCO would subtract the sub-meter readings from the readings of U.S. Steel's meter. This arrangement was im-

plemented in the fall of 2007, and since that time, ArcelorMittal has purchased all of the electricity consumed at the Plate Mill from NIPSCO in this manner.

NIPSCO did not agree to implement a similar sub-metering arrangement for natural gas service to the Plate Mill. Rather, NIPSCO informed the Steel Producers that NIPSCO's gas meter for the Plate Mill could not be installed on U.S. Steel's internal gas lines and that the meter had to be located near the existing NIPSCO meter at the Gary Works property line. According to NIPSCO, a new dedicated service line would have to be installed to allow NIPSCO to transport natural gas directly to the Plate Mill. Due to the location of the Plate Mill within Gary Works, this new service line would be over three miles long. The Steel Producers proposed alternative arrangements and requested written confirmation from NIPSCO that its transportation of natural gas to the ArcelorMittal Plate Mill did not violate any natural gas transportation tariffs or contracts. After NIPSCO declined to provide such assurances, no further progress was made toward an agreement regarding gas service to the Plate Mill.

As the date for reopening the Plate Mill drew closer, U.S. Steel sought assurances from NIPSCO that NIPSCO would not take legal action against U.S. Steel for acting as a public utility based on its provision of electricity and gas service to ArcelorMittal. NIPSCO's corporate counsel subsequently advised U.S. Steel that NIPSCO would not provide the requested assurances unless U.S. Steel resolved a separate, unrelated contract dispute pending before the Indiana Court of Appeals. U.S. Steel refused, and since the fall of 2007, ArcelorMittal has arranged for and purchased its own natural gas from suppliers other than NIPSCO and has paid U.S. Steel for the interstate and intrastate transportation and delivery of that natural gas for its use at Gary Works. U.S. Steel has, in turn, arranged and paid NIPSCO for the transportation of ArcelorMittal's natural gas within Indiana for the benefit of ArcelorMittal. NIPSCO delivers ArcelorMittal's gas to a point near the property line of Gary Works, and U.S. Steel uses its internal distribution infrastructure within Gary Works to deliver that gas to ArcelorMittal and its Plate Mill.

On September 27, 2007, the Steel Producers filed an informal complaint against NIPSCO with the Commission's Consumer Affairs Division (the "CAD") seeking a determination that their actions with regard to electricity and gas service to the Plate Mill did not violate any tariff, contract, or other utility law requirement and asking the CAD to undertake an investigation of NIPSCO for its allegedly unreasonable behavior in refusing to provide the requested assurances. On October 1, 2007, NIPSCO filed a formal complaint against U.S. Steel with the Commission seeking a determination that U.S. Steel had violated Indiana law and NIPSCO's tariffs by selling electricity and gas service to ArcelorMittal.

On October 4, 2007, the Steel Producers received a letter from the CAD informing them that, due to the complex nature of the issues presented, the CAD would not take further action on the Steel Producers' informal complaint and directing them to file a formal complaint with the Commission. On the same date, the Steel Producers filed a formal complaint with the Commission, the substance of which was identical to their previously-filed informal complaint. The Steel Producers also incorporated their complaint as a counterclaim in their answer to NIPSCO's complaint. At a prehearing conference on November 14, 2007, NIPSCO's and the

Steel Producers' complaints were consolidated into one action.

On January 15, 2008, the Steel Producers filed a motion for summary judgment seeking a determination that U.S. Steel's provision of gas and electricity to the Plate Mill did not violate any tariff, utility contract, or other law. NIPSCO filed its response to the Steel Manufacturer's motion on March 17, 2008. On January 15, 2008, NIPSCO filed a motion to dismiss the Steel Producers' counterclaim, which alternatively sought judgment on the pleadings with reference to the Steel Producers' claims. The Steel Producers filed their response to NIPSCO's motion to dismiss on February 19, 2008.

On April 22, 2008, the parties presented oral argument on their motions at a public hearing. Two years later, on May 11, 2010, the Commission issued the order giving rise to this appeal. The Commission dismissed the claims raised by the Steel Producers, concluding that the Commission was permitted, but not obligated, to undertake an investigation of a public utility at the request of less than ten utility customers, and that the Commission declined to do so in this case. Further, the Commission denied the Steel Producers' motion for summary judgment and instead granted summary judgment in favor of NIPSCO. In so doing, the Commission made the following relevant conclusions:

1. By its sale of electricity to ArcelorMittal, U.S. Steel was acting as a public utility.

2. By providing electric service to ArcelorMittal within [NIPSCO's] service territory, U.S. Steel violated I.C. § 8–1–2.3, *et seq.*

3. By transporting gas to ArcelorMittal, an end use consumer as set forth in I.C. § 8–1–2–87.5(b)(2), U.S. Steel was and is acting as a public utility.

4. U.S. Steel violated [NIPSCO's] tariff by reselling gas to ArcelorMittal between 2003 and 2007.

5. Because U.S. Steel is a utility by virtue of transporting gas "within the state on behalf [an] end use consumer", U.S. Steel must obtain a necessity certificate from the commission as set forth in I.C. § 8–1–2–87.5(b).

Appellant's App. p. 21.

On June 1, 2010, NIPSCO filed a motion for reconsideration asking the Commission to add findings and conclusions to its final order on issues allegedly raised by NIPSCO but not addressed in the Commission's final order. The Commission denied the motion without comment on August 18, 2010. This appeal ensued. Additional facts will be provided as necessary.

### Standard of Review

■■■ "The General Assembly created the Indiana Utility Regulatory Commission primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." *N. Ind. Pub. Serv. Co. v. United States Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind.2009) (*"NIPSCO"*). The Commission is charged with insuring that public utilities provide constant, reliable, and efficient service to the citizens of Indiana. *Id.* The Commission can only exercise power conferred upon it by statute, and any doubts regarding the Commission's statutory authority must be resolved against the existence of such authority. *United Rural Elec. Membership Corp. v. Ind. & Mich. Elec. Co.*, 549 N.E.2d 1019, 1021 (Ind. 1990).

■ In a separate case involving these same litigants, our supreme court recently discussed the standard of review applicable in appeals from summary judgment orders of the Commission. *NIPSCO*, 907 N.E.2d at 1018. In *NIPSCO*, the court

noted that appellate courts review a trial court's summary judgment order *de novo* "because the reviewing court faces the same issues that were before the trial court and analyzes them the same way." *Id.* But because agencies are executive branch institutions empowered by the General Assembly with delegated duties, the court concluded that their adjudications deserve a higher level of deference. *Id.* Thus, appellate courts reviewing summary judgment orders of the Commission apply the established, statutory standard of review generally applicable to judicial review of the Commission's orders. *Id.*

■■■ This standard has multiple tiers. *Id.* at 1016. On the first level, we must review the entire record to determine whether there is substantial evidence to support the Commission's findings of basic fact. *Id.* At the second level of review, ultimate facts, or mixed questions of fact and law, are reviewed for their reasonableness, with the amount of deference owed depending on whether the issue falls or does not fall within the Commission's expertise. *Id.* at 1016, 1018. Finally, legal propositions are reviewed for their correctness. *Id.* at 1018 (citing *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314, 1318 (Ind.1998)). More precisely, "an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order." *Id.* at 1016. Generally, an agency's reasonable interpretation of a statute it is charged with enforcing is entitled to great weight. *Indiana Dep't of Envtl. Mgmt. v. Steel Dynamics, Inc.,* 894 N.E.2d 271, 274 (Ind.Ct.App.2008), *trans. denied.* However, the Commission's interpretation of statutes defining the limits of its juris-diction is reviewed *de novo. Town of Chandler v. Indiana–American Water Co.,* 892 N.E.2d 1264, 1267–68 (Ind.Ct.App. 2008).

## I. Electricity Service

At the outset, we note that the parties dispute the level of deference owed to the Commission's conclusions that U.S. Steel has acted as a public utility. The Steel Producers assert that the statutes defining the phrase "public utility" limit the scope of the Commission's jurisdiction to regulate U.S. Steel, and the Commission's interpretation of them is therefore reviewed *de novo.* NIPSCO argues that the Commission's conclusion that U.S. Steel acted as a public utility is entitled to deference on appeal because "the Commission has jurisdiction to determine whether an entity is a public utility and the Commission acted within its jurisdiction in determining whether [U.S. Steel] was a public utility." Appellee's Br. at 17.

■■■ It is well-settled that the Commission possesses the authority to make a preliminary determination of an entity's status as a public utility and to compel parties to appear before it for the purpose of making such a determination. *See Ind. Util. Regulatory Com'n v. Gary Joint Venture,* 609 N.E.2d 7, 10 (Ind.Ct.App.1993), *trans. denied, abrogated on other grounds, Austin Lakes Joint Venture v. Avon Utils., Inc.,* 648 N.E.2d 641, 646–49 (Ind. 1995); *Hidden Valley Lake Prop. Owners Ass'n v. HVL Utils., Inc.,* 408 N.E.2d 622, 629 (Ind.Ct.App.1980). However, just as a trial court's authority to make an initial determination of whether it has subject matter jurisdiction in a given case does not clothe it with the authority to decide the merits of a case where subject matter jurisdiction is lacking, the Commission's authority to make a threshold determination of an entity's public utility status does not

give the Commission jurisdiction to regulate that entity if it does not qualify, *ab initio*, as a public utility.

The statutory definitions of "public utility" set forth in the Public Service Commission Act are not statutes the Commission is charged with enforcing; rather, they restrict the Commission's regulatory jurisdiction. *See United States Steel Corp. v. N. Ind. Pub. Serv. Co.*, 482 N.E.2d 501, 505–06 (Ind.Ct.App.1985) ("*U.S. Steel I*") (holding that the Commission would not acquire jurisdiction over steel producer upon completion of proposed project pursuant to which producer would transmit and mix power purchased from two separate public utilities because producer would not thereby become a public utility as defined by statute), *clarified on reh'g*, 486 N.E.2d 1082 ("*U.S. Steel II*"), *trans. denied. See also United States Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 797 (Ind.2000) (holding that the Commission lacked plenary jurisdiction over municipal utility because such utilities are specifically exempted from the statutory definition of public utility). Thus, we owe the Commission's conclusion that U.S. Steel has acted as a public utility no deference on appeal and now proceed to review it *de novo.*

At issue in this appeal is the proper interpretation of statutory provisions defining "public utility" for the purposes of the Public Service Commission Act. *See* Ind.Code §§ 8–1–2–1, –87.5 (2010). In statutory construction, our primary goal is to ascertain and give effect to the intent of the legislature. *Gray v. D & G, Inc.*, 938 N.E.2d 256, 259 (Ind.Ct.App. 2010). The language of the statute itself is the best evidence of legislative intent, and we must give all words their plain and ordinary meaning unless otherwise indicated by statute. *Id.* Furthermore, we presume that the legislature intended statutory language to be applied in a logical manner consistent with the statute's underlying policies and goals. *Id.* However, we will not interpret a statute which is clear and unambiguous on its face; rather, we will give such a statute its apparent and obvious meaning. *Ind. State Bd. of Health v. Journal–Gazette Co.*, 608 N.E.2d 989, 992 (Ind.Ct.App.1993), *adopted,* 619 N.E.2d 273 (Ind.1993).

The Steel Producers argue that the Commission erred in concluding that U.S. Steel's provision of electricity to the ArcelorMittal Plate Mill made U.S. Steel a public utility subject to the Commission's regulatory jurisdiction. Indiana Code section 8–1–2–1(a) provides the following definition of public utility:

> Except as provided in section 1.1 of this chapter, "public utility", as used in this chapter, means every corporation, company, partnership, limited liability company, individual, association of individuals, their lessees, trustees, or receivers appointed by a court, that may own, operate, manage, or control any plant or equipment within the state for the:
>
> (1) conveyance of telegraph or telephone messages;
>
> (2) production, transmission, delivery, or furnishing of heat, light, water, or power; or
>
> (3) collection, treatment, purification, and disposal in a sanitary manner of liquid and solid waste, sewage, night soil, and industrial waste.
>
> The term does not include a municipality that may acquire, own, or operate any of the foregoing facilities.

Ind.Code § 8–1–2–1.

This court considered whether a steel producer was a public utility pursuant to section 8–1–2–1(a) in *U.S. Steel I*. 482 N.E.2d at 505–06. U.S. Steel owned two production facilities: Gary Works in

Indiana and South Works in Chicago. *Id.* at 502. NIPSCO supplied electricity to Gary Works, while Commonwealth Edison Company supplied electricity to South Works. *Id.* U.S. Steel brought a declaratory judgment action to determine whether its plan to connect its facilities and mix some of the electricity purchased from each utility so that power could be shared between the two facilities would be subject to regulation by the Commission. *Id.*

This court held that the Commission would not acquire jurisdiction over U.S. Steel upon implementation of the plan because U.S. Steel would not become a public utility under section 8–1–2–1(a). *Id.* at 505. The court began its analysis by comparing the statutory definitions of "utility" and "public utility." *Id.* at 505. The General Assembly has defined "utility" to mean "every plant or equipment within the state used for ... the production, transmission, delivery, or furnishing of heat, light, water, or power, *either directly or indirectly to the public* [.]" Ind.Code § 8–1–2–1(g) (emphasis added). The statutory definition of *public* utility, however, contains no express requirement of service to the public. *See* I.C. § 8–1–2–1(a). This court has noted the "conspicuous absence" of the phrase "either directly or indirectly to the public" from section 8–1–2–1(a), but concluded that the omission was not problematic because "[o]ur Supreme Court has clearly explained when a business and its utilities are *private* and when they are public." *Id.* at 505.

The *U.S. Steel I* court went on to cite heavily from the decision of our supreme court in *Foltz v. City of Indianapolis,* a case in which our supreme court addressed the constitutionality of an Indianapolis ordinance that allowed a parking commission to condemn property for lease or sale to private parties for the purpose of constructing off-street parking facilities, but

deprived the commission of the power to control the rates charged to the public for use of such facilities. 234 Ind. 656, 667, 130 N.E.2d 650, 654 (1955). In upholding the ordinance, the *Foltz* court discussed at length the distinction between public and private businesses for the purposes of eminent domain. The *Foltz* court reasoned that:

> The common law from the time of the Year Books is replete with cases which placed the duties and responsibilities of serving the public generally upon this limited group of specified businesses. This classification of 'public callings' or businesses 'affected with a public interest,' comprises to a large extent what are known today as public utilities. They are in most cases regulated by the state. Upon the dedication of a business to a public use, it is established that such business is under a common law duty to serve all who apply so long as facilities are available, without discrimination.
>
> \*     \*     \*
>
> 'It is an essential requirement that a business or enterprise must in some way be impressed with a public interest before it may become a public utility. Accordingly, whether the operator of a given business or enterprise is a public utility depends on whether or not the service rendered by it is of a public character and of public consequence and concern, which is a question necessarily dependent on the facts of the particular case.'

*Id.* at 667, 669, 675, 130 N.E.2d at 655, 656, 659 (citations omitted) (quoted in *U.S. Steel I,* 482 N.E.2d at 505–06). The *U.S. Steel I* court relied on this language to conclude that, upon implementation of its proposed plan, U.S. Steel's business would not be impressed with a public interest and, thus, "by definition, U.S. Steel w[ould]

not become a 'public utility' subject to the [Commission's] jurisdiction and our laws regulating public utilities[.]" *Id.* at 506.

The court expanded this analysis on rehearing in *U.S. Steel II,* 486 N.E.2d 1082. Initially, the court noted that prior to 1955, the definition of public utility required ownership or control of equipment for the transmission of water or power "directly or indirectly to or for the public[.]" 486 N.E.2d at 1084. A 1955 amendment broadened the definition to include sewage and waste treatment facilities, but omitted the phrase "directly or indirectly to or for the public." *Id.* Applying several rules of statutory construction, the court concluded that the omitted phrase must be read back into the definition of public utility. First, the court noted the absurdity that would otherwise result:

> If the Legislature had intended the amended "public utility" definition to be literally applied, any person or corporation owning any facility for the transmission of electric power or water would be a "public utility" whether or not such commodities were to be publicly or privately consumed. Thus, any homeowner transmitting water from house to garden through his garden hose, or electric power to hedge trimmer through his extension cord would be a "public utility" subject to [Commission] jurisdiction. We will not presume such a patent absurdity was intended by the Legislature.

*Id.* Additionally, the court noted the general rule that, when necessary, courts must supply words plainly implied by the context of a statute, yet "palpably omitted" and necessary to effectuate the legislative purposes behind the statute. *Id.* at 1085. Finally, the court cited the general rule that, where possible, statutes must be construed in a manner to support their constitutionality, and concluded that section 8–1–2–1(a) passed constitutional muster only

when the omitted language is read back into the statute because "[a]ny attempt to impress public utility status upon private property not dedicated to public use constitutes a taking thereof for public use without just compensation in violation of the Fourteenth Amendment." *Id.*

Thus, the parties agree that we must read the statutory definition of public utility to refer to any entity "that may own, operate, manage, or control any plant or equipment within the state for the ... production, transmission, delivery, or furnishing of heat, light, water, or power [*directly or indirectly to the public.*]" Ind. Code § 8–1–2–1(a); *U.S. Steel II,* 486 N.E.2d at 1085. At issue in this case is whether U.S. Steel's delivery of electricity to ArcelorMittal for use at the Plate Mill amounted to service directly or indirectly to the public. The Commission answered this question affirmatively, concluding that "[o]nce [U.S. Steel] began transmitting and selling electricity to an entity other than itself, it became a public utility." Appellant's App. p. 17.

Seizing on the language of *U.S. Steel I,* the Steel Producers argue that the Commission erred in concluding that U.S. Steel had acted as a public utility because U.S. Steel's delivery of electricity to ArcelorMittal was the result of a private agreement in no way impressed with a public interest. More precisely, the Steel Producers argue that in order for U.S. Steel's electricity service to be impressed with a public interest, U.S. Steel must offer utility service to the general public, and because U.S. Steel offered service only to ArcelorMittal under a special agreement, U.S. Steel cannot be deemed a public utility. NIPSCO, on the other hand, asserts that the common law of public callings, as discussed in *Foltz* and adopted in *U.S. Steel I,* is inapposite here because the leg-

islature has provided a legislative definition of public utility.

We need not resolve the dispute concerning the applicability of the common law in this context in order to dispose of the issue before us. Because the parties agree that the phrase "directly or indirectly to the public" must be read back into the statute in accordance with this court's holding in *U.S. Steel II*, we base our analysis on the meaning of that phrase.

The Oxford English Dictionary defines "the public" as "[t]he community or people as a whole; the members of the community collectively." *The Oxford English Dictionary*, (3d ed.2007), *OED Online*, available at http://oed.com/viewdictionaryentry/Entry/154052. Here, however, U.S. Steel has provided electricity to only one customer located within its industrial complex pursuant to a special agreement. Under these facts and circumstances, we cannot conclude that U.S. Steel delivered electricity directly or indirectly to the public. We therefore conclude that the Commission erred when in determined that U.S. Steel's delivery of electricity to ArcelorMittal made it a public utility for the purposes of section 8–1–2–1(a).

Our conclusion finds support in *BP Products North America, Inc. v. Indiana Office of Utility Consumer Counselor*, 947 N.E.2d 471 (Ind.Ct.App.2011), *reh'g pending*, a recent decision of this court addressing the same issue. In that case, BP provided various utility services to a handful of private entities located on and adjacent to BP's petroleum refinery in Whiting, Indiana. *Id.* 947 N.E.2d at 473–74. The Commission concluded that BP was acting as a public utility for the purposes of section 8–1–2–1(a) because it was "providing electric service to an entity other than itself[.]" *Id.* 947 N.E.2d at 478. Another panel of this court reversed, concluding that because BP provided services to

"selected companies—a special class of entities that did not make up the indefinite public—it was engaged in a private activity, not the provision of services directly or indirectly to the public." *Id.* 947 N.E.2d at 480. We agree with this reasoning from our court's *BP* opinion and adopt it here.

Additionally, we find *Public Service Commission v. Panhandle Eastern Pipeline Co.*, 224 Ind. 662, 71 N.E.2d 117 (1947), *aff'd*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128, the major case upon which NIPSCO relies, to be distinguishable from the case at hand. In that case, Panhandle owned a large pipeline through which in transported natural gas from Texas and Kansas into and across other states, including Indiana. *Id.* at 666, 71 N.E.2d at 119. In Indiana, Panhandle furnished gas to ten public utilities and four municipalities, which, in turn, distributed the gas to end use consumers within the State. *Id.* Additionally, Panhandle delivered gas directly to a large glass manufacturing company pursuant to a privately negotiated contract. *Id.* And, as noted by the Supreme Court, Panhandle had announced its intent "to render service directly to large industrial consumers wherever possible." *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 509, 68 S.Ct. 190, 92 L.Ed. 128 (1947).

Panhandle argued that it was not subject to state regulation because its service direct to large industrial consumers in Indiana did not make it a public utility for the purpose of the Public Service Commission Act. *Panhandle*, 224 Ind. at 684, 71 N.E.2d at 127. Our supreme court applied the earlier version of section 8–1–2–1(a), which required "transmission, delivery, or furnishing of heat, light, water or power . . . either directly or indirectly to or for the public." *Id.* at 685, 71 N.E.2d at 127. In holding that Panhandle's direct distribution to consumers was subject to state

regulation, the *Panhandle* court noted that a public utility has a duty "to serve on reasonable terms all those who desire the service it renders" and is not permitted "to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give." *Id.* at 686, 71 N.E.2d at 127. The court reasoned that " 'a corporation, calculated to compete with public utilities and take away business from them, should be under like regulatory restriction if effective governmental supervision is to be maintained.' " *Id.* (quoting *Indus. Gas Co. v. Pub. Utils. Comm'n of Ohio*, 135 Ohio St. 408, 21 N.E.2d 166, 168 (1939)) (emphasis omitted). Thus, because Panhandle was competing with local public utilities in soliciting the business of large industrial consumers and was in a position to discriminate in its services and rates, the court concluded that it was a public utility subject to state regulation. *Id.* at 686–87, 71 N.E.2d at 127–28.

The concerns that motivated our supreme court's conclusion in *Panhandle* are not present here. U.S. Steel never attempted to compete with NIPSCO; U.S. Steel is in the business of steel production, not the provision of utility services. Because of the unique circumstances presented by the November 2003 facilities swap, ArcelorMittal became the owner of one facility located deep within Gary Works. U.S. Steel provided electricity not in an attempt to displace NIPSCO as an electricity supplier, but out of convenience and as a continuance of its previous distribution of electricity to itself when it owned the Plate Mill. Nor can it be said that the potential for discrimination in services and rates raises a legitimate concern here.

U.S. Steel distributed electricity to ArcelorMittal only, within the confines of the Gary Works industrial complex, solely for the operation of the Plate Mill. U.S. Steel did not attempt to cherry-pick profitable customers, nor did its decision to service only ArcelorMittal leave others without needed utility service. For these reasons, and under the unique circumstances presented here, we conclude that *Panhandle* is not controlling.

U.S. Steel provided electricity to only one selected company operating a facility located within U.S. Steel's large industrial complex. Because these actions did not amount to distribution directly or indirectly to the public, U.S. Steel did not thereby become a public utility under section 8–1–2–1(a). We therefore remand to the Commission with instructions to vacate the portion of its order concluding that U.S. Steel acted as a public utility by providing electricity to ArcelorMittal.[2]

**II. Service Area Assignments Act**

■ Next, the Steel Producers argue that the Commission erred in concluding that U.S. Steel had violated Indiana's Service Area Assignments Act by selling electricity to ArcelorMittal within NIPSCO's exclusive electric service area. The relevant statute provides that:

If an electricity supplier unlawfully renders or extends retail electric service within the assigned service area of another electricity supplier, the electricity supplier which has the sole right to furnish retail electric service in that assigned service area may bring an action in the circuit or superior court of the county where such assigned service area is located to enjoin the other electricity supplier from rendering or extending such unlawful retail electric service.

2. This is not to say that some level of regulation over the type of activity at issue here would not be in the public interest. However, we must leave such public policy determinations to the legislative branch of our government, the General Assembly.

If a violation is proved, the violator shall pay to the aggrieved electricity supplier the gross revenues derived by the violator from the sale of electric service within the assigned service area of the aggrieved electricity supplier, all witness fees, court costs and reasonable attorneys' fees incurred in any litigation brought to enforce this section.

Ind.Code § 8–1–2.3–4(b) (2010). An "electricity supplier" is defined as "a public utility, a local district rural electric membership corporation, or a municipally owned electric utility which furnishes retail electric service to the public." Ind. Code § 8–1–2.3–2 (2010). It is undisputed that U.S. Steel is neither a local district rural electric membership corporation nor a municipally owned electric utility. And because we have determined that U.S. Steel has not acted as a public utility by providing electricity to ArcelorMittal, we conclude that the Commission erred in determining that ArcelorMittal was an "electricity supplier" as that term is used in section 8–1–2.3–4(b). Therefore, on remand, we instruct the Commission to vacate the portion of its order concluding that U.S. Steel violated the Service Area Assignments Act.

### III. Gas Transportation

■ Next, the Steel Producers argue that the Commission erred in concluding that U.S. Steel acted at a public utility by delivering natural gas to ArcelorMittal at the Plate Mill. The Public Service Act supplies a separate definition of public utility that applies exclusively to the transportation of natural gas. *See* Ind.Code § 8–1–2–87.5(b) (2010). The statute provides that:

Any person, corporation, or other entity that:

(1) is engaged in the transportation of gas from outside Indiana for direct sale or delivery to any end use consumer or consumers within this state;

(2) is engaged in the transportation of gas solely within this state on behalf of any end use consumer or consumers; or

(3) is an end use consumer engaged in the transportation within this state of gas owned or acquired by such end use consumer for use in this state, other than transportation on the premises where the gas is consumed;

is a public utility as defined in [Indiana Code section 8–1–2–1] and must obtain a necessity certificate from the commission before it may engage in any activities described in this subsection.

*Id.* Here, the Commission concluded that U.S. Steel's activities fell within the second prong of this definition; that is, that U.S. Steel was engaged in the transportation of gas within the state (specifically, within Gary Works) on behalf of an end use consumer, ArcelorMittal.

The Steel Producers make no attempt to argue that U.S. Steel's activities did not bring it within the language of subsection (2); rather, the main thrust behind their argument is that the application of the statute to U.S. Steel's activities is incompatible with legislative intent. However, we need not delve into the legislative intent behind section 8–1–2–87.5(b) because subsection (2) is clear and unambiguous. *See Peele v. Gillespie*, 658 N.E.2d 954, 958 (Ind.Ct.App.1995) (noting that we will not interpret clear and unambiguous statutes and will instead give them their apparent and obvious meaning), *trans. denied.*

Subsection (2) provides that anyone "engaged in the transportation of gas solely within this state on behalf of any end use consumer or consumers" is a public utility. There is nothing unclear or ambiguous about this language; thus, we need not engage in statutory interpretation and will instead give the statute its apparent and

obvious meaning. Because section 8–1–2–87.5(b)(2) applies to anyone transporting gas within Indiana on behalf of an end use consumer, and U.S. Steel has transported and continues to transport natural gas on behalf of ArcelorMittal, the end use consumer of that gas, we conclude that the Commission correctly determined that U.S. Steel acted as a public utility. The Steel Producers' arguments concerning legislative intent and speculation concerning possible undesirable results flowing from the application of the statute to the circumstances at hand are simply requests for this court to disregard the plain language of the statute.[3]

Moreover, the Steel Producers have not adequately established that application of section 8–1–2–87.5(b) to the case at hand contravenes legislative intent. The Steel Producers claim that the statute was only intended to regulate bypass arrangements whereby "a consumer extends facilities to connect directly to an interstate pipeline, thereby bypassing the distribution system of the local gas utility and avoiding its state-regulated rates." Appellant's Br. at 31. Here, NIPSCO's state-regulated gas distribution services are not bypassed; NIPSCO delivers gas to Gary Works, which U.S. Steel then distributes to ArcelorMittal. According to the Steel Producers, section 8–1–2–87.5(b) was never intended to apply to such arrangements.

In support of this assertion, the Steel Producers cite a portion of NIPSCO's response to the Steel Producers' motion for summary judgment in which NIPSCO states, without citation to authority, that "[i]n 1985, faced with announced plans by several large industrial customers to bypass their local natural gas utilities and connect directly to interstate pipelines, the Indiana legislature made clear that providing service to just one end-use consumer subjects the provider to the regulatory framework as a public utility[.]" Appellant's App. pp. 365–66. The Steel Producers also cite a United States district court case for the proposition that "Indiana law . . . imposes more specific requirements that apply to so-called 'bypass' arrangements[.]" *Midwestern Gas Transmission Co. v. McCarty*, 120 F.Supp.2d 1155, 1159 (S.D.Ind.2000), *reversed on other grounds*, 270 F.3d 536 (7th Cir.2001).

The sources cited by the Steel Producers are not controlling authority in this court. *See Plaza Group Props., LLC v. Spencer Cnty. Plan Comm'n*, 877 N.E.2d 877, 894 (Ind.Ct.App.2007) (federal district court decisions may be persuasive, but they are not binding authority on state courts), *trans. denied*. And, in any event, we do not believe that these sources sup-

---

**3.** In their reply brief, the Steel Producers appear to suggest that there is some ambiguity in subsection (2). Specifically, they claim that if the statute is applied "strictly on its literal terms," then an entity will become a public utility under subsection (2) by transporting gas on behalf of itself as the ultimate end use consumer. Appellant's Reply Br. at 31. We fail to see the relevance of this argument because this case does not present such a situation, and subsection (2) undoubtedly reaches the conduct at issue here, U.S. Steel's gas transportation on behalf of ArcelorMittal, an end use consumer. Moreover, we disagree. If we were reading subsection (2) in a vacuum, the Steel Producers' argument might give us pause. However, we examine the language of the statute as a whole, without overemphasizing a strict literal reading of individual words. *Butler Univ. v. Estate of Verdak*, 815 N.E.2d 185, 194 (Ind.Ct.App.2004). When subsection (2) is properly read in conjunction with the rest of the statute, it becomes clear that subsection (2) addresses an entity's transportation of gas on behalf of an end use consumer other than itself, while subsection (3) addresses an end use consumer's transportation of natural gas on its own behalf. *See* I.C. § 8–1–2–87.5(b).

port the Steel Producers' assertion that the legislature intended section 8–1–2–87.5(b) to cover bypass arrangements *only*. In its response to the Steel Producers' motion for summary judgment, NIPSCO noted that the planned bypass arrangements were the impetus behind the enactment of the statute, but claimed that the legislature's intent was to regulate any entity distributing gas to any consumer. Similarly, in *Midwestern Gas*, the court simply noted that section 8–1–2–87.5(b) was applicable to bypass arrangements; such a conclusion does not preclude the statute's application to other types of gas distribution, including a pass-through arrangement like the one at issue here.

Nor can we discern from the language of the statute any legislative intent to limit the application of section 8–1–2–87.5(b) to bypass arrangements. The terms of the statute do not limit its application to situations in which the local public utility is cut out of the equation. Indeed, as NIPSCO notes, the word "bypass" does not appear anywhere in the statute. If the legislature had intended to so limit the application of section 87.5(b), it could have worded the statute accordingly. Keeping in mind that it is just as important to recognize what a statute does not say as it is to recognize what it does say, *Peele v. Gillespie*, 658 N.E.2d 954, 958 (Ind.Ct.App.1995), *trans. denied*, we decline the Steel Producers' request that we read into section 8–1–2–87.5(b) the additional requirement that the entity engaging in gas distribution must do so as part of a bypass arrangement.[4]

▮▮ Next, the Steel Producers argue that the "on premises" exception found in subsection (3) of section 8–1–2–87.5(b) applies here. Subsection (3) provides that an entity that "is an end use consumer engaged in the transportation within this state of gas owned or acquired by such end use consumer for use in this state, *other than transportation on the premises where the gas is consumed*" is a public utility. (Emphasis added). The Steel Producers argue that the exception is applicable to their activities because U.S. Steel is transporting gas solely within the premises of the Gary Works industrial complex, where it is consumed by ArcelorMittal. We disagree.

▮▮ Section 8–1–2–87.5(b) is written in the disjunctive; an entity may become a public utility by satisfying any one of the three subsections. Because it has already been established that U.S. Steel's activities brought it within subsection (2), whether it satisfies subsection (3) is irrelevant. Moreover, because U.S. Steel is not an end use consumer of the gas it transports to ArcelorMittal, subsection (3) does not apply here. *See* I.C. § 8–1–2–87.5(b)(3) (on premises exception only applies to "an end use consumer engaged in the transportation ... of gas"). Additionally, the plain language of the statute makes it clear that in order for the on premises exception to apply, the end use consumer of the gas must be transporting the gas to itself for its own use. *See id.* (on premises exception applies to "an end use consumer engaged in the transporta-

---

4. The Steel Producers also point out that the Commission itself conceded that its interpretation of section 87.5(b) "creates a level of obligation on the part of [U.S. Steel] that it is unlikely the legislature either desired or envisioned." Appellant's App. p. 19. However, the Commission went on to note that it was also unlikely "that the legislature anticipated the current complex arrangements in which multiple owners and lessees exist within the confines of an otherwise-self-contained industrial island." *Id.* Thus, the Commission was simply noting that the legislature probably did not contemplate that section 87.5(b) would apply to the circumstances at hand because it probably did not envision unique arrangements such as these taking place.

tion within this state of gas *owned or acquired by such end use consumer for use* in this state" (emphasis added)). As that is not the case here, subsection (3) and its on premises exception do not apply.[5]

█ Next, the Steel Producers argue that, section 8–1–2–87.5(b) notwithstanding, U.S. Steel must also satisfy the section 8–1–2–1(a) definition of public utility in order to be classified as a public utility based on its delivery of natural gas to ArcelorMittal. Again, we disagree. When two statutes cover the same subject and one does so in general terms while the other does so in specific terms, the more specific statute should be applied. *State Farm Ins. v. Freeman,* 847 N.E.2d 1047, 1049 (Ind.Ct.App.2006) (citing *Ross v. State,* 729 N.E.2d 113, 116 (Ind.2000)). Indiana Code section 8–1–2–1(a) provides the generally applicable definition of public utility, while section 8–1–2–87.5(b) sets forth a definition of public utility specifically applicable to the transportation of natural gas. Thus, to the extent the provisions conflict, section 8–1–2–87.5(b) controls.

Finally, the Steel Producers briefly argue that the Commission's conclusion that U.S. Steel has acted as a public utility pursuant to section 8–1–2–87.5 will result in an unconstitutional taking of private property. In support of this argument, the Steel Producers quote *U.S. Steel II* for the proposition that "[a]ny attempt to impress public utility status upon private property not dedicated to public use constitutes a taking thereof for public use without just compensation in violation of the Fourteenth Amendment." 486 N.E.2d at 1085 (citing *Producers' Transp. Co. v.*

*R.R. Comm'n of Cal.,* 251 U.S. 228, 40 S.Ct. 131, 64 L.Ed. 239 (1920)).

█ What the Steel Producers fail to note is that the kind of "public utility status" to which the court referred in *U.S. Steel II* is materially different than that at issue here. In *U.S. Steel II,* the court was addressing the generally applicable definition of public utility. *Id.* Generally, public utilities are under an obligation to render reasonably adequate service, without discrimination and on reasonable terms, to all members of the public who desire it. *Panhandle,* 224 Ind. at 685, 71 N.E.2d at 127; Ind.Code § 8–1–2–4 (2010). Because the state has mandated that such public utilities use their private assets in the public interest, the state has, for constitutional purposes, taken private property and must therefore provide reasonable compensation. *Gorka v. Sullivan,* 671 N.E.2d 122, 132 (Ind.Ct.App.1996) (citing *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 307, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989)), *trans. denied.*

█ Here, however, the Commission concluded that U.S. Steel's transportation of gas on ArcelorMittal's behalf made it a public utility under section 8–1–2–87.5(b), the statute applicable only to the transportation of natural gas. Because section 87.5(b) only requires transportation to or on behalf of "any end use consumer or consumers" as opposed to transportation "directly or indirectly to the public," the statute reaches a much broader range of entities and activities than section 8–1–2–1(a). As a result, the legislature has not sought to require providers of gas transportation services under section 8–1–2–87.5(b) to provide service to the general public; rather, the statute simply provides

---

5. The Steel Producers also make much of the fact that the Commission's conclusion in this case conflicted with previous orders of the Commission. However, the Commission is not bound by its prior rulings and is free to correct past errors. *Ind. Bell Tel. Co. v. Ind. Util. Regulatory Comm'n,* 715 N.E.2d 351, 358 (Ind.1999).

that an entity engaging in the specified activities must seek authorization from the Commission in the form of a necessity certificate. Thus, although providers of gas transportation services are subject to the Commission's regulatory jurisdiction, they are not required to dedicate their property to public use. Accordingly, no taking occurs when an entity is found to be a public utility under section 8–1–2–87.5(b).

Here, the Commission did not mandate that U.S. Steel dedicate its private property to a public use. Rather, the Commission simply concluded that U.S. Steel must obtain a necessity certificate as set forth under section 8–1–2–87.5. Appellant's App. p. 21. Additionally, the Commission noted that U.S. Steel may petition for alternative regulatory treatment under Indiana Code chapter 8–1–2.5, which allows the Commission to decline to exercise full jurisdiction over an entity found to be a public utility. *Id.* at 21. And if U.S. Steel is unwilling or unable to take advantage of either of these options, it could simply cease its transportation of natural gas on ArcelorMittal's behalf. Because U.S. Steel will not be required to dedicate its property to a public use, no unconstitutional taking will occur.

For all of these reasons, we conclude that the Commission correctly determined that U.S. Steel's delivery of natural gas to ArcelorMittal makes U.S. Steel a public utility pursuant to Indiana Code section 8–1–2–87.5(b).

### IV. NIPSCO's Gas Tariff

■ Next, the Steel Producers argue that the Commission erred in concluding that U.S. Steel had violated NIPSCO's gas tariff by reselling natural gas it purchased from NIPSCO. The applicable tariff provides that "[g]as transported by [NIPSCO] for a Customer contracting for service hereunder shall be for the sole and exclusive benefit of such Customer and shall not be available for resale except under the provisions of the Nomination Exchange and Imbalance Exchange Services of [NIPSCO's] Gas Transportation Rate Schedules." Rate 328, Rate for Gas Service, Transportation and Transportation Balancing Service.

The Steel Producers make no argument that U.S. Steel's sale of gas purchased from NIPSCO to ArcelorMittal fell under the provisions of NIPSCO's Nomination Exchange and Imbalance Exchange Services, nor do they argue that U.S. Steel's actions did not constitute resale. Rather, without ever citing the language of the applicable tariff, they argue that the ban on resale was only intended to ensure that NIPSCO's gas sales remain retail in nature, thereby preventing NIPSCO from becoming subject to federal regulations applicable to wholesale gas distributors. The Steel Producers claim that the tariff has not been violated because, under the circumstances presented here, U.S. Steel's sale of natural gas to ArcelorMittal did not make NIPSCO a wholesale gas seller.

The Steel Producers cite no authority supporting their assertion that Rate 328 was designed to prevent NIPSCO from being classified as a wholesale gas seller. Moreover, the plain language of the tariff simply prohibits resale, without any such qualification. The Steel Producers do not, and cannot in good faith, claim that U.S. Steel did not resell gas purchased from NIPSCO. We therefore conclude that the Commission correctly concluded that U.S. Steel's resale of natural gas purchased from NIPSCO to ArcelorMittal violated NIPSCO's tariff ban on resale.

### V. Dismissal of the Steel Producers' Complaint

■ Next, the Steel Producers argue that the Commission erred in dismissing their complaint against NIPSCO. When a

group of ten or more customers initiates a complaint against a public utility, the Commission "*shall* proceed, with or without notice, to make such investigation as it may deem necessary or convenient." Ind. Code § 8–1–2–54 (2010) (emphasis added). On the other hand, Indiana Code section 8–1–2–34.5(b) (2010) provides that "[n]otwithstanding IC 8–1–2–54, the commission *may* investigate and enter orders on complaints filed by individual customers arising under this section." (Emphasis added). *See also* Ind.Code § 8–1–2–58 (2010) ("Whenever the commission shall believe . . . that an investigation of any matters relating to any public utility should for any reason be made, it *may*, on its motion, summarily investigate the same, with or without notice." (Emphasis added)).

Section 8–1–2–54 is inapplicable here because only two customers, U.S. Steel and ArcelorMittal, joined in the complaint against NIPSCO. And because sections 8–1–2–34.5(b) and 8–1–2–58 are phrased in permissive terms, the Commission was under no obligation to investigate the Steel Producers' complaint and acted within its discretion in dismissing it.

Nevertheless, the Steel Producers argue that under the circumstances of this case, they were entitled to a decision from the Commission. In support of this assertion, the Steel Producers remind us that they initially filed an informal complaint with the Commission's CAD and only filed a formal complaint with the Commission after the CAD informed them that it would not take action on their informal complaint. The Steel Producers argue that they were entitled to a binding decision from the CAD on their informal complaint, and that they should not be penalized for following the CAD's instructions by filing a formal complaint with the Commission.

The CAD was established by the Commission pursuant to Indiana Code section 8–1–2–34.5(b), which provides in relevant part:

> The commission may establish an appeals division to act on its own behalf regarding individual customer complaints. The decision of the division shall be binding on all parties to the complaint. The commission shall review decisions of the appeals division upon timely request by an affected party.

Any individual or entity may file an informal complaint with the CAD, and such an informal complaint is without prejudice to the right to file a formal petition under Indiana Code section 8–1–2–54. 170 Ind. Admin. Code 1–1.1–5.

Although the creation of the CAD itself was discretionary with the Commission, the Steel Producers, seizing on the language found in section 8–1–2–34.5(b) providing that a CAD decision *shall* be binding on the parties and appealable to the Commission, argue that the CAD, unlike the Commission, was required to issue a binding decision. We disagree. The language of the statute simply provides that a CAD decision, *if issued,* is binding and appealable to the Commission; the statute contains no requirement that the CAD actually render a decision. We fail to see how the Commission's exercise of discretion in creating the CAD could entitle the Steel Producers to a binding decision from the CAD that the Commission itself was in no way required to issue. *See* Ind.Code §§ 8–1–2–34.5(b), –54. Moreover, Commission regulations provide that the CAD "may refer a complaint to the commission for review at any time during the review process based on the complexity of issues or circumstances involved in a complaint[.]" 170 Ind. Admin. Code 16–1–5. Based on this provision and the foregoing analysis, we conclude that the CAD, like the Commission, was not obligated to in-

vestigate or issue an order on the Steel Producers' complaint.

■ Additionally, the Steel Producers could have, but failed to appeal the CAD's decision not to proceed on their informal complaint to the Commission. As noted above, section 8–1–2–34.5(b) provides that the Commission shall review CAD decisions upon a timely request by a party. *See also* 170 I.A.C. 1–1.1–5, 16–1–6 (providing that dispositions of the CAD may be appealed to the Commission within 20 days after the disposition is rendered). Here, when the Steel Producers were notified by the CAD that it had declined to investigate their complaint, they did not seek review of that disposition by the Commission. Rather, they simply filed their complaint with the Commission. Because they failed to follow the proper procedure to seek administrative review of the CAD's decision not to investigate their complaint, the Steel Producers cannot now collaterally attack that decision in this court.

■ Finally, the Steel Producers argue that the dismissal of their complaint was improper because its claims against NIPSCO were meritorious and because the dismissal undercuts the public policy underlying Indiana's utility regulatory scheme, which "operates primarily to protect consumers and assure them of continuing service at a reasonable price." *NIPSCO v. Citizens Action Coal. of Ind., Inc.,* 548 N.E.2d 153, 159 (Ind.1989). However, the language of the applicable statutes clearly provides that the Commission was empowered, but not required, to investigate their complaint and issue a written decision, without regard to the merits of the complaint. *See* I.C. §§ 8–1–2–34.5(b), –54. It is not our prerogative to strip the Commission of the discretion it has been afforded by the General Assembly with regard to the handling of customer complaints.

■ Finally, the Steel Producers argue that the Commission erred by dismissing their counterclaim in addition to their complaint. The Steel Producers appear to argue that because their counterclaim was properly pleaded pursuant to Commission regulations, they were somehow entitled to a binding decision on its merits. We disagree. Prior to the consolidation of NIPSCO's and the Steel Producers' complaints, the Steel Producers filed an answer to NIPSCO's complaint along with a counterclaim which incorporated the Steel Producers' complaint by reference. The Steel Producers did not become entitled to a Commission investigation or decision by simply incorporating their complaint by reference and labeling it a counterclaim. The Commission did not err in dismissing the Steel Producers' complaint and counterclaim against NIPSCO.

## VI.  NIPSCO's Cross–Appeal

On cross-appeal, NIPSCO argues that the Commission failed to address three of the claims it raised in its complaint. Specifically, NIPSCO asserts that the Commission was silent on the following issues: (1) whether U.S. Steel's distribution of electricity to ArcelorMittal "violated NIPSCO's tariff prohibition on resale of its electric service"; (2) whether U.S. Steel's "use of its NIPSCO gas transportation account to transport gas for ArcelorMittal violates NIPSCO's tariff prohibition on resale of NIPSCO's transportation service"; and (3) whether U.S. Steel's "bundled gas service to ArcelorMittal made [U.S. Steel] an uncertificated public utility in violation of Indiana law and NIPSCO's gas service territory." Appellee's Reply Br. at 4. NIPSCO seeks a declaration from this court that the Commission's silence on these issues did not amount to an implicit resolution of these claims against NIPSCO and that these claims therefore remain

viable theories of recovery in NIPSCO's separate federal court action seeking damages from U.S. Steel. In the alternative, if we determine that the Commission did resolve these issues against NIPSCO, NIPSCO requests remand to the Commission with instructions to enter specific findings on these issues.

At the outset, we note that the Commission did, in fact, address the third claim listed above. In its order, the Commission concluded that U.S. Steel's transportation of natural gas on ArcelorMittal's behalf made U.S. Steel a public utility under section 8–1–2–87.5(b)(2). U.S. Steel had not yet obtained a necessity certificate, and without that certificate, U.S. Steel violated Indiana law when it transported natural gas to ArcelorMittal. *See* I.C. § 8–1–2–87.5(b) (requiring an entity to obtain a necessity certificate *before* it engages in any of the activities described in that subsection). Additionally, in footnote 10 of its order, the Commission noted that

> NIPSCO alleged that it was the sole authorized gas provider within the Gary Works. While this may be true, gas providers do not have monopoly service areas in the same way electricity providers do, and there is no provision in the gas transportation statute for damages parallel to the electric service area's damage provision of I.C. § 8–1–2.3–4(b).

Appellant's App. p. 11. Thus, the Commission concluded that U.S. Steel violated Indiana law by transporting natural gas on ArcelorMittal's behalf. Moreover, the Commission concluded that NIPSCO's "gas territory" was not violated because there is no such thing as an exclusive gas service territory under Indiana law. U.S. Steel does not dispute these conclusions on appeal.

With regard to the remaining claims, we note that it is not for this court to prospectively determine the preclusive effect of the Commission's order in future litigation.

And even if we were inclined to make such a determination, it is unclear what, if any, binding effect it would have on the federal court. However, we need not dwell long on this question. NIPSCO acknowledges that parties may raise alternative theories of liability and that "a tribunal may choose to rule on less than all alternative theories presented." Appellee's Br. at 46. Accordingly, we conclude that the Commission was not required to address NIPSCO's additional claims, and chose not to do so. Remand is therefore unnecessary.

## Conclusion

The Commission erred in concluding that U.S. Steel's distribution of electricity to ArcelorMittal made it a public utility pursuant to Indiana Code section 8–1–2–1(a) and in its determination that U.S. Steel had violated the Service Area Assignments Act. Accordingly, we remand to the Commission with instructions to vacate these portions of its order. However, the Commission correctly determined that U.S. Steel's transportation of gas on ArcelorMittal's behalf made it a public utility for the purposes of Indiana Code section 8–1–2–87.5(b) and that U.S. Steel violated NIPSCO's tariff prohibition on the resale of natural gas. Additionally, we conclude that the Commission did not err in dismissing the Steel Producers' claim against NIPSCO. With regard to NIPSCO's cross-appeal, we conclude that the Commission did, in fact, address one of the claims NIPSCO claims it overlooked, and properly chose not to address the remaining two.

Affirmed in part, reversed in part, and remanded with instructions.

FRIEDLANDER, J., and MAY, J., concur.